[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a case brought for a marital dissolution, custody of the minor children issue of the marriage, a division of the marital estate, alimony, and support.
The court finds that the parties married in Encarnacion, Paraguay in South America on February 11, 1981. The court will further find that the plaintiff has resided at least one year next to the date of filing of the complaint in the State of Connecticut. The court will further find that there are two minor children issue of the marriage, Sylvia E. born on October 26, 1981 and Natalie D. born on December 12, 1984. The court will further find that the marriage has broken down irretrievably.
The basic cause for the breakdown of the marriage seems to be excessive drinking on the part of the defendant and abusive behavior on the part of the defendant towards the plaintiff. The wife testified to the fact that the husband frequently came home drunk, and often while drunk was physically and verbally abusive to her. The defendant denies that he drank or that if he drank he did not drink to excess. He put on a friend of his to testify that he never saw the defendant intoxicated. However, the court finds the plaintiff's versions of the incidents which occurred during the course of the marriage were more believable as the plaintiff was a more credible witness than the defendant.
The parties met when the plaintiff applied for employment at a dress manufacturing establishment owned by the defendant. While in Paraguay the plaintiff was trained as a seamstress and at the time of her employment she was a seventeen year old, and the defendant was twenty years her senior. Within three months of her seeking employment with the defendant the parties were married. They remained in Paraguay for a period CT Page 7462 of approximately two years before coming to the United States. There was an incident she testified to and which he evidently admitted of an instance in Paraguay when he lost his temper and struck her. At the time she did not want to leave Paraguay but her claim is that he forced her to leave with him.
The defendant has an interesting background. He was born in Poland and at sometime during his youth he escaped to Germany. From Germany he travelled to South Africa where he obtained employment in the mining industry and where he learned to use explosives during the course of his employment. The defendant evidently had prior relationships because he had a son in Poland and he had a daughter in South Africa. There was no testimony as to whether these were legitimate or illegitimate children though his health certificate lists the current marriage as his third. This was the first marriage for the plaintiff.
At the time the parties left Paraguay to come to the United States he evidently brought with him thirteen or fourteen sewing machines which had been used in his unsuccessful business venture in Paraguay. After arrival in the United States the plaintiff opened up a store as a seamstress at which time she was using about three of the defendant's machines. The store was opened in late 1984 and burned down in 1987. Subsequently the plaintiff started up another business as a seamstress and this store burned down around 1992. The plaintiff claims that during a period of roughly 1984 to 1987 while she was running this business she was contributing all of her money to the support of the family. During a period of time from 1984 until 1988 the defendant procured work as a blaster, originally starting out at about $8.00 an hour and working up to approximately $16.00 an hour until he had his first heart attack in 1988. Out of the money he earned he accumulated in his own name at least $28,000.00 which first shows up in his name as trustee for Natalie D. Tyc, one of the parties children, in November of 1987. On the 30th day of January 1988 the defendant withdrew $28,183.46. On May 5, the money shows up in an account in the name of Joseph Tyc as custodian for his daughter Sylvia Tyc, the other child of the marriage, in another bank and this time in the amount of $25,000.00 which means that the defendant disbursed something in excess of $3,000.00 between the end of January and early May, 1988. The $25,000.00, with interest CT Page 7463 for a total of $25,474.26, was withdrawn by the defendant on August 11, 1988. The money has never been accounted for. As indicated the plaintiff claims that she was the one who supported the house, paid the rent, bought the food, and paid the utilities without any help from the defendant. It would seem that with her minimal income that this could not have been possible without help from the defendant but by the same token the defendant would not have been able to accumulate as much money as he did had he been pulling his full weight at home.
It was in late 1988 that the defendant had his first heart attack. Subsequent to this heart attack, he has worked a total of two jobs for approximately three months each. The plaintiff had a second heart attack on February 5, 1992. In between these heart attacks, as indicated earlier, he worked a total of two jobs for a total period of six months, which was his only income plus some SSI income that he received. He claims that he was limited in the kind of work he could undertake after his first heart attack and that though he secured two jobs, they both let him go when they found out he had experienced a heart attack because of the fear that the employers might have some increased exposure because of his health in the area of workers' compensation. There is a note in the appeal of his attorney on his workers' compensation claim which indicates that in fact he was let go on one of the jobs because he was just too slow in his work and it had nothing to do with his heart attack. It seems that he did receive some training in between the time of the first and second heart attack in some accounting procedure so that he could secure work in a much less strenuous area than he had been doing as a blaster, which was a very strenuous physical job.
This brings us to the major issue which arises as a result of this dissolution and that is how much if any of his workers' compensation benefits become part of the marital estate that can be used for both distribution between the husband and wife and how much can be used as child support for the benefit of the minor children. This seems to be an issue which has never really been decided beyond the superior court level here in the State of Connecticut. The reason that this becomes as important as it does is that his current income is limited and possibly for some time in the future his earnings will be limited to what he receives as part of his disability CT Page 7464 payments from his workers' compensation. It is also important for the purposes of dividing up what is currently being held in payments made to him in the past and whether or not they are assets of the marital estate. The importance here is that the financial affidavits really show no other estate other than the claim for workers' compensation.
There were arguments advanced during the course of the trial that the workers' compensation claim breaks down into two areas. There is compensation for lost wages and medical expenses and then there is compensation for loss of bodily function which compensations are separate and distinct from one another. There didn't seem to be too much dispute as to whether or not the spouse, in this case the wife, was entitled to a share of the lost earnings and medical expenses as received by the defendant. The defendant heartily contested whether or not any compensation received for loss of bodily function was part of the marital estate. In the course of the argument the parties developed that there seemed to be two positions on these questions in the State of Connecticut and that these were opinions of the Superior Court published in the Connecticut Supplement. In the first instance the party cited Raccio v. Raccio, 41 Conn. Sup. 115 as standing for the proposition that the spouse is entitled to some share of the claimant's recoveries under the workers' compensation claim. Close reading of the Raccio case doesn't really state this as the law of the case. The Raccio case dealt with a matter which the incapacitated party had against another party who was the actual tort feasor on a product liability theory. This tort was also the cause of the injury for which the claimant received workers' compensation. The court decided that the tort claim for the injuries sustained on the products liability theory was part of the marital estate and since it was a future claim awarded the defendant part of the net recovery. The courts award was contingent upon the amount of the recovery and the amount of the award was calculated based upon the amount of the actual recovery. The case itself did not deal with a workers' compensation claim as such so that in some respects or in many respects it did not address the actual issues in this case. However, the case did cite some law in other jurisdictions which shed some light as to whether or not the claim under the workers' compensation act would be marital property, a portion of which could be assigned to the spouse as part of the marital estate. CT Page 7465
The other case was Rodrigues v. Rodrigues, 42 Conn. Supplement 34. This matter did deal with the issue of whether alimony and support could be ordered from an estate comprised of a specific injury award to a workers' compensation recipient. The question was whether or not these awards were includable in the defendant's net income for purposes of determining the amount of child support required by the statutory child support guidelines. The court found that such an award could not be made from this particular type of estate. The court in Rodrigues v. Rodrigues, "concluded that the payments being received by the defendant as a result of a specific injury award are not includable as income for the purpose of determining child support pursuant to the statutory child support guidelines. Such payments are neither in lieu of wages nor are they based on loss of earnings. They are based on the loss of part of the employees body (as from amputation) loss of its use or loss of a function of the body."
What really has to be addressed in this particular case is whether or not the plaintiff and her children are entitled to alimony and support payments out of (1) the award for lost earnings, if any, and (2) from the award made for loss of bodily function, in this particular case a 40% loss of the heart muscle due to heart attacks suffered as a result of his employment.
One of the first issues to be resolved is whether or not alimony and/or support is within the exemptions statute, in this case § 31-320 of the Conn. Gen. Statutes, which states that "all sums due for compensation under the provisions of this chapter shall be exempt from attachment and execution and shall be non-assignable before and after the award." There is only one case in Connecticut that addresses this particular statute and in that case the court stated that the defendant's workers' compensation award could be garnished by the welfare commissioner in an action for reimbursement of funds expended for care and maintenance of defendant's family. "The purpose of this exemption statute is to provide support money to claimant and his dependents." State of Connecticut v. RodneyReed, Conn. Cir. Ct. 69.
It is generally been held that a constitutional or statutory exemption of wages or payments under workers' compensation laws for claims from debt does not prevent the CT Page 7466 enforcement of alimony or support against sums due from these sources . . . 24 Am Jur.2d 764 (Divorce and Separation). The gist of the cases cited under the general propositions stated is that alimony is not a debt to the party in the ordinary sense of the word. See also, Communes vs. Bragg, 183 Oklahoma 122, 80 P.2d 287 which says that the wife is not a "creditor" and a claim (for alimony) is not a debt within the provisions of the statute. Oklahoma had an exemption statute similar to the State of Connecticut's. The position taken in the State of Connecticut is that "a dependent" under the Act is not necessarily one to whom the contributions of the injured or deceased workman are necessary to his or her support of life; the test is, whether the contributions were relied upon by the dependent for his or her means of living, judging this by the class and position and life of the dependent. Powers v. Hotel Bond Co., 89 Conn. 143 (1915). The court in Powers further went on to say that "partial dependency may exist, though the contributions be at regular intervals and in irregular amounts, and though the dependent have other means of support." This was pretty much the situation in the instant case since the wife did have a business of her own and wasn't totally dependent for her income upon the defendant though there was the ordinary and natural obligation of one spouse to support the other.
Further, unlike some jurisdictions the court in thePowers case did not limit dependency to only a deceased recipient of workers' compensation but to one who was injured and had a continuing obligation to support his dependents. Also, the basis of alimony is usually considered to be the natural obligation of one spouse to the other, and the principle purpose of the exemption laws is to protect an unfortunate debtor and preserve a means of support for the debtor's family, and therefore applies in divorce cases,2 ALR 2nd Divorce and Separation, § 264. It has further been stated that alimony is an allowance for support and maintenance as a substitute for marital support, 2 ALR 2nd, [2 A.L.R.2d], Divorce andSeparation, § 520. A decree for alimony, is not strictly speaking, due either as damages or as a penalty; nor is it a debt in the strict legal sense of that term but rather a judgment of the court calling for the performance of a duty made specific by a decree of the court, 2 ALR 2nd, [2 A.L.R.2d], Divorce andSeparation, § 531. At least alimony is not a debt in the sense that a decree therefore establishes it as a antecedent liability. Bielan v. Bielan, 135 Conn. 163, 62 A. 2nd, 664. CT Page 7467
The workers' compensation act is meant to protect not only the beneficiary of the funds but his family and thereby prevent them from becoming the objects of charity or dependent upon the state; the fact that an order for support and alimony is not a debt within the ordinary meaning of the word and therefore not subject to the exemptions statute and that these benefits should be reachable to satisfy the claims of wife and children has been sustained in other jurisdictions. SeeSounders v. Sounders, 246 A.D., 579, 284 N.Y.S. 356 (1935); Donovanv. Donovan, 15 Mass. App. 61, 443 N.E.2d 432 (1982);Dallesandro v. Dallesandro, 110 Misc. 2nd 346; 442 N.Y.S.2d 400 (1981); Steller v. Steller, 97 N.J. Super. 493, 235 A.2d 476
(1967).
The award from workers' compensation that has been made to the defendant for a loss of bodily function is currently being held in escrow by Attorneys Gersten and Forbes and Attorneys Yules and Yules and presently is in the amount of $102,369.76.
This sadly enough is one of those situations where the plaintiff's income is minimal at best and until now never showed income in excess of six or seven thousand dollars per year and frequently less than that and that the defendant according to him, though the court has some reservations on his employability, has no means of supporting himself. These parties throughout the years of their marriage have accumulated no estate, though at one time the defendant did have $25,000 plus some gold stock that either is no longer in existence or of minimal value according to their financial affidavits. As a result there is virtually nothing to split up except for the workers' compensation awards.
There is a further complication in that the plaintiff did lend to the defendant sums of money for various personal purposes. One example is that $2,700 was lent by the plaintiff to the defendant for the purpose of bringing over a daughter he had from a prior relationship in South Africa. The defendant in that instance borrowed $2,700 for what was strictly a personal purpose of his own, in having his daughter come to visit him. Further, defendant shows a loan from one Edward Orzel on his financial affidavit in the amount of $10,000. A large percentage of this $10,000 was spent on a trip to Poland to see his son who is the product of a previous CT Page 7468 relationship in Poland. Whether it was a marriage or not is not clear though he did allege that he was married to a woman in Poland before leaving Poland for Germany. On his visit, the defendant gave $5,000 of the money borrowed to his son as a gift. Besides the cost of the vacation, other monies were spent for the purpose of buying a car here in the United Therefore the defendant's net from workers' compensation will be approximately $143,130.64, after deducting the 20% attorneys fees that is due Attorneys Yule and Yule. There might also be some small fees due the escrow agents for holding the escrowed funds. Also, the funds are accumulating interest which will effect the ultimate net estate. Since the monies paid through workers' compensation is intended for the benefit of the family, as herein before noted, the court feels very strongly that this sum represents the defendant's estate and that the plaintiff would therefore be entitled to a part of it as a marital asset. If we treat it therefore as a marital asset the plaintiff will have some right to a share of the monies paid for the loss of bodily function.
However, since these are not income to the defendant, such as weekly earnings, it would not be possible to allocate any support to the children out of this sum. This would be in keeping with the findings in Rodrigues v. Rodrigues, (supra) However, during the course of the trial the defendant did indicate that since he was not able to support the children he would be willing to set up a trust fund for the children in an amount of $10,000.00 each for their education. Based upon these findings, the court will enter the following orders:
1. The court will find that the marriage is broken down irretrievably and accordingly will enter a decree dissolving the marriage.
2. Custody of the two minor children shall remain in the plaintiff with reasonable rights of visitation in the defendant. The visitation shall be based upon the defendant not being intoxicated at such time as he exercises his right of visitation. Reasonable rights of visitation includes the opportunity for the defendant to have the children on over night visits on week-ends or at times when it does not interfere with their schooling.
3. The court will find that the plaintiff is entitled to a share in her husband's estate consisting of the monies CT Page 7469 currently being held in escrow, plus the balance due on the award. The court will award plaintiff 40% of the net amount presently being held in escrow by the various attorneys for the defendant and 40% of the net amount still to be received. The net amount shall be that amount which is left over after payment of all attorneys fees and expenses for collecting and/or holding these amounts in escrow.[1]
4. Since the court is unable to award support in this case, the court will order the establishment of the two trust funds, one for each of the minor children in the amount of $10,000.00 to be set aside for their education as offered by the defendant.
5. The court is going to further order the defendant to pay the plaintiff the sum of $2,700 which she had loaned to him so that he might have his daughter from South Africa visit with him.
6. Since the order gives the plaintiff assets of her own the court will not award attorneys fees as requested by the plaintiff.
7. The plaintiff will maintain health insurance, as available through her place of employment for the benefit of the minor children. All unreimbursed medical, dental, ophthalmological, orthodontics, psychiatric and psychological bills shall be shared equally between the parties.
8. The defendant shall further be responsible for tuition at the Sacred Heart School in the amount of $989.00 and a bill to the New Britain General Hospital in the amount of $703.00.
Kline, State Trial Referee